CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

March 27, 2025

LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| Derek Sandidge, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:22-cv-00144 |
| | ) | |
| Harold Clarke *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Derek Sandidge, a Virginia inmate proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983, alleging numerous violations of his constitutional rights under the Eighth and Fourteenth Amendments during his incarceration at Red Onion State Prison. He specifically complains that his assigned security designation of "S" (resulting in segregation) should have been removed after an institutional disciplinary charge conviction against him was dismissed. This memorandum opinion addresses the remaining claims in the case, upon which the remaining Defendants have moved for summary judgment. (Dkt. 31.) For the reasons explained herein, the court will grant Defendants' motion for summary judgment and dismiss this action.

## I.    Procedural and Factual Background

### A. Procedural History

Defendants Harold Clarke, David Robinson, Robert Bivens, Carl Manis, T. Harvey, Karen Stapleton, and C. Meade previously filed a motion to dismiss for failure to state a claim as to all claims against them.  (Dkt. 21.)  Defendants Larry Collins, D. Turner, and Shannon Fuller previously filed a partial motion to dismiss for failure to state an equal protection claim against them.  (*Id.*)  Due to Sandidge's failure to respond to Defendants' motions, the Court granted Defendants' motions to dismiss, terminating Defendants Clarke, Robinson, Bivens, Manis, Harvey, Stapleton, and Meade from the case, and dismissing the equal protection claims against Defendants Collins, Turner, and Fuller.  (Dkt. 24.)[1]  In response to the court's Order, Sandidge advised the court on March 6, 2023, that he wished to proceed with the remaining claims against Defendants Larry Collins, D. Turner, Shannon Fuller, and Penny McCowan. (Dkt. 25.)  These Defendants then filed a motion for summary judgment as to all the remaining claims asserted against them.  (Dkt. 31.)

The remaining Defendants and claims are as follows[2]:

Count #1:  Defendant Collins, Unit Manager, violated Sandidge's Fourteenth Amendment rights by depriving Sandidge of a protected liberty interest without due process when he reviewed and approved Sandidge's Security Classification

---

[1] In recognition of the Fourth Circuit's directive in *Stevenson v. City of Seat Pleasant, Md.,* 743 F.3d 411, 416 (4th Cir. 2014), the court reviewed the motion to ensure that dismissal would have also been proper on the substance of the motions so that the court's dismissal of the moving parties was not based solely upon Sandidge's failure to oppose the motion to dismiss.  The arguments asserted (*see* Mem. in Supp. of Defs.' Mot. to Dismiss, Dkt. 22) are well-founded, correctly apply the governing law to the minimal facts asserted by Sandidge, and largely duplicate the analysis contained in this Memorandum Opinion.  The court would have dismissed Sandidge's claims on the substantive bases asserted in the prior motion to dismiss irrespective of his failure to oppose it.  Sandidge's complaint was not formally sufficient to state a claim, and he did not object subsequently to the court's dismissal of the claims in Dkt. 24.

[2] This organization does not duplicate the organization utilized in Sandidge's complaint, which presented no less than thirty-three "claims," but the court agrees that the organization proposed by Defendants using "counts" (as modified herein) is useful in capturing more clearly the causes of action asserted by Sandidge.  Sandidge did not object to the reframing.

Special Designation S (hereinafter "S-designation") on August 5, 2020, and September 16, 2020. (Compl., Dkts. 1 ¶¶ 2–3; Compl. Stmt. of Facts, 1-1 at 2–4.)

Count #3:  Defendant Collins reviewed and erroneously approved Sandidge's S-designation on August 5, 2020, and September 16, 2020, in violation of Sandidge's Eighth Amendment rights to be free from cruel and unusual punishment because the dismissal of the institutional charge should have resulted in a re-classification.  (Dkts. 1 ¶¶ 5–6; 1-1 at 2–4.)

Count #4:  Defendant D. Turner, Chief of Housing and Programs ("CHAP"), violated Sandidge's Fourteenth Amendment rights by depriving Sandidge of a protected liberty interest without due process when he failed to properly address Sandidge's complaint form (grievance) on August 31, 2020.  (Dkts. 1 ¶¶ 7–8; 1-1 at 5.)

Count #6: Defendant Turner failed to properly address Sandidge's complaint form (grievance) on August 31, 2020, with deliberate indifference in violation of his Eighth Amendment rights.  (Dkts. 1 ¶ 10; 1-1 at 5.)

Count #9:  Defendant Fuller, Assistant Warden, violated Sandidge's Fourteenth Amendment rights by depriving Sandidge of a protected liberty interest without due process when he failed to properly address Sandidge's grievances on November 13, 2020, and December 31, 2020.  (Dkts. 1 ¶¶ 14–15, 21–22; 1-1 at 12, 16.)

Count #11:  Defendant Fuller failed to properly address Sandidge's grievances on November 13, 2020, and December 31, 2020, in violation of Sandidge's Eighth Amendment rights.  Fuller is responsible under the theory of supervisory liability.  (Dkts. 1 ¶¶ 17–18, 24; 1-1 at 12, 16.)

Count #12:  Defendant McCowan, Lieutenant, failed to properly address Sandidge's complaint form (grievance) on October 9, 2020, in violation of Sandidge's Eighth and Fourteenth Amendment rights.  (Dkts. 1 ¶¶ 19–20; 1-1 at 13.)

Additionally, the court will address Sandidge's core contention – which he identified in

his complaint as "Claim 1" — his belief that the dismissal of the institutional charge entitled

him to removal of the S-designation.[3] This contention lays the factual predicate and legal basis for all Sandidge's subsequent claims. Sandidge did not name any particular Defendant as specifically responsible for "Claim 1." Essentially, he faults all Defendants for not rectifying what he perceived to be his ongoing misclassification after the institutional disciplinary charge dismissal.

None of the counts asserted in the complaint against the remaining Defendants state an Eighth Amendment conditions of confinement claim (which the court has no evidence that it was administratively exhausted as required)[4] or complain about Sandidge's 1M track assignment, his assigned good time credit level, or his designation of Security Level 6 after his completion of the requirements to earn release from S-designation. The grievances submitted by Sandidge to show administrative exhaustion (Dkt. 1-1) complain about the same alleged failure as asserted in the complaint--the failure to remove Sandidge's S-designation after his disciplinary charge was dismissed.

Sandidge opposed the motion for summary judgment by submitting a brief (Dkt. 39) and a declaration (Dkt. 38), both of which the court considered. The court also considered all

---

[3] Sandidge refers to the designation "S" as a "Security Level." Under Virginia Department of Corrections ("VDOC") policies, the "S" designation is technically not an independent "Security Level" but instead a "Specialty Designation" that is assigned in addition to an inmate's "Security Level." (Dkt. 32-6, VDOC Operating Proc. 830.2 §§ IV(A)(2), (G)(1).) However, even VDOC's own regulations use the terms inconsistently and refer to "Security Level S." (*See, e.g., id.* § IV(D)(3).) Defendants often do so as well both in their affidavits and briefing. In any event, any distinction between a "level" and a "designation" does not alter the court's analysis herein.

[4] Sandidge's complaint does not use the word "condition" at any point, and he does not identify any of the types of treatment that would be actionable under an Eighth Amendment conditions of confinement claim, such as inadequate food or sanitation. The only "condition" claimed by Sandidge as violating the Eighth Amendment is Sandidge's continued S-designation, which he equates to "wrongful imprisonment" because of the dismissal of the institutional charge. (*See, e.g.,* Dkt. 1 ¶ 6.) Sandidge does not contend that the S-designation is, by itself, cruel and unusual punishment in all cases. He merely contends that the ongoing retention of the S-designation was "cruel and unusual" after the charge was dismissed.

factual allegations made by Sandidge in his verified complaint.[5]   However, Sandidge's complaint does not contain factual allegations *per se*.   Rather, the complaint only asserts his legal "claims" without any section that designates the facts supporting his claims.   The facts that can be distilled from the claims as described by Sandidge are not in dispute and/or do not create material disputes.[6]   They relate to dates of occurrences, dates of grievances, the fact that the disciplinary charge was dismissed, and that he was held in segregation.   Therefore, the facts set forth in Defendants' memorandum in support of the summary judgment motion as the Statement of Undisputed Facts—those numbered 1 to 39—are accepted as true.   (Dkt. 32 at 4–14.)   Sandidge does dispute the legal conclusions that flow from these facts, and the court will address the merits of the disputed legal conclusions below.

### B.  Factual Background

1.  <u>Facts Relating to Sandidge's Institutional Charge</u>

---

[5] As a general rule, after a party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); Fed. R. Civ. P. 56(c), (e).  However, a plaintiff's "*verified* complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge."  *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021) (italics in original).  Here, Sandidge's complaint was verified, so the court did consider the factual content contained within the complaint.

[6] The court considered all of the things claimed by Sandidge in Dkt. 39 to be "facts" in dispute.  All are not disputes about facts and/or they are disputes about facts that are not material.

First, Sandidge disputes that he waived his right to be present at the September 10, 2020, Institutional Classification Authority ("ICA") review. (Dkts. 38 at 4; 39 at 1.)  But, there is no actual dispute about this fact because Defendants also agree that he did **not** waive his right to be present at this hearing.  (Dkt. 32 at 11 ¶ 30 (stating that Sandidge did not waive his 48-hour notice and that he participated in the hearing).)

Sandidge also contends Defendants had the authority to remove his S-designation. (Dkt. 39 at 1–2.)  This is a disputed legal conclusion, not a dispute about facts.

Sandidge notes disagreement with which privileges he actually received when he was at certain security levels and designations.  (*Id.* at 2.)  These contentions would relate to a conditions of confinement claim if one had been asserted, but they are not material to the claims asserted about the S-designation.

Additionally, the court considered whether further discovery was needed in this case before considering the motion.  Defendants responded to all discovery requested by Sandidge (*see* Dkts. 42 and 43), and Sandidge has not identified any specific additional materials or information needed.  As noted above, the court's opinion herein hinges on the legal conclusions arising from the undisputed material facts.

Sandidge's offense that led to his incarceration in 2011 was a violent offense.  (Aff. of Randall Mathena, Dkt. 32-3 ¶ 4 (stating that Sandidge was sentenced for malicious wounding and assault with a severely injured victim and possession/use of a sawed-off shotgun).)  Sandidge was previously housed at Sussex I with an assigned Security Classification Level of 4.  (Dkt. 1-1 at 6.)  During his incarceration at Sussex I, Sandidge assaulted a guard on May 28, 2020.  (Dkt. 32-3 ¶ 4.)  The guard suffered a broken nose, a swollen/black eye, cuts, and bruises and required outside medical attention.  (*Id.*)  Sandidge was transferred from Sussex I to Red Onion State Prison on June 10, 2020.  (Dkt. 32 at 8 ¶ 22.)

Because of his attack on the guard, Sandidge was charged with an institutional disciplinary charge referred to as a "105a" charge, which penalizes offenders who physically assault a non-inmate resulting in serious bodily harm.  (*See id.* at 13 ¶ 36; Dkt. 32-1 ¶ 9; *see also* VDOC OP 861.1 Attach. 2 (describing the 105(a) offense)[7].)  He was initially found guilty of this charge.  (Dkt. 1-1 at 1 (showing hearing officer's decision of guilty).)  Sandidge then appealed utilizing the institution's grievance procedures (*id.*), and the institutional charge was ultimately dismissed on August 5, 2020.  (Dkt. 32-3 ¶ 3.)  A copy of that determination was mailed to Sandidge, who received the notification that the institutional charge had been dismissed on August 14, 2020.  (Dkts. 32 at 10 ¶ 29; 1-1 at 5.)  Neither party provided information about why the institutional charge was dismissed.  But Sandidge also was charged in a criminal proceeding arising from the same incident.  He pled guilty to the criminal charge and was convicted of assaulting the guard in the Sussex County Circuit Court on August 12, 2022.  (Dkt. 32 at 9–10 ¶ 28; *see* Case No. CR21000214-00, Sussex County Circuit Court,

---

[7] Pursuant to Federal Rule of Evidence 201, the court takes judicial notice of this regulation, which is not in dispute.

https://perma.cc/73DT-AK4B (search by court and case number) (last visited March 25, 2025).)

Sandidge does not deny that he assaulted the guard, that the guard was injured to the extent noted above, or that he was subsequently criminally convicted of the assault after pleading guilty. He merely asserts that the dismissal of the institutional disciplinary charge removed the justification for him to be assigned the S-designation and entitled him to be re-classified at a lower security level. He equates the alleged wrongful retention of the S-designation with "being punished despite [his] innocence," (Dkt. 1 ¶ 2), and "wrongful imprisonment." (*Id.* ¶ 6.) Try as he might, dismissal of the charge does not establish Sandidge's innocence. The attack was videotaped, Sandidge does not deny it, and he plead guilty to it. Sandidge further does not consider or address the other factors relevant to his security designation assignment.

2.  Facts Related to Sandidge's Security Classifications and Designations under VDOC's Operating Procedures

Virginia Department of Corrections' ("VDOC") Operating Procedures ("OP")[8] provide a complex and highly regulated system of numerous designations that govern inmates' housing assignments, privileges, and good time accrual. This system is, in part, described in *Smith v. Collins*, 964 F.3d 266, 280 (4th Cir. 2020). Additionally, the undisputed facts in paragraphs 3 to 19 in Defendants' memorandum in support of the summary judgment motion (Dkt. 32 at 4–8) describe the applicable procedures. The OPs describe the standards for the various designations assigned to inmates, the procedures applicable to review of the

---

[8] Procedures relevant only to particular local institutions are referred to as Local Operating Procedures ("LOP").

designations, who has the authority to assign and remove the designations, and the corresponding privileges afforded inmates that are associated with each designation. Sandidge does not contest which procedures are applicable, and he does not contend he did not receive any hearings or reviews to which he was entitled, other than his belief that he was entitled to another annual review after dismissal of the institutional charge.

### 3. Facts Related to the Process Sandidge Received and Collins' Involvement

After his transfer to Red Onion on June 10, 2020, Sandidge received his first formal Institutional Classification Authority ("ICA") hearing on July 6, 2020. (Aff. of Larry R. Collins, Dkt. 32-1 ¶ 4.) Sandidge was given the S-designation[9] because of the seriousness of his attack on the guard at Sussex I, during which Sandidge "pushed and repeatedly punched a corrections officer in the face[,] knocking him to the ground." (*Id.*)

Defendant Collins is the Unit Manager of the C Building at Red Onion. (*Id.* ¶ 1.) Collins was not involved in the July 6, 2020, ICA hearing or in recommending Sandidge's initial S-designation. (*Id.* ¶ 4.) Defendants attached to Collins' affidavit as "Enclosure A" the document evidencing the initial assignment process. (*Id.* at 7.) This document reveals that a non-defendant (the ICA, Eric Miller) recommended the S-designation, a non-defendant (James Blevins) administratively reviewed the recommendation, and a non-defendant (Henry Ponton) finally approved the designation as a representative of the Central Classification Services' ("CCS") review. (*Id.*) Despite Collins' lack of involvement in the original

---

[9] Inmates can appeal any designation assigned to them under the grievance system. (Dkts. 32 at 7–8 ¶ 19; 32-6, VDOC OP 830.2 § IV(K).) Sandidge does not claim that he grieved his initial assignment to S-designation, and he does not claim any constitutional violations associated with his initial assignment to "S."

designation, Sandidge contends that Collins should be held liable because he had the authority to remove or recommend against the S-designation during subsequent reviews.

If the ICA recommends the S-designation after a hearing, that recommendation is reviewed by the CCS, the Warden of Red Onion, and the Western Regional Operations Chief. (Dkt. 32 at 5 ¶ 8.)  VDOC procedures call for separate, frequent reviews of an inmate's S-designation.  The status is to be reviewed at least every 90 days.  (Dkts. 32-6, VDOC OP 830.2 §§ IV(G)(7)–(10); 32-8, VDOC LOP 830.A § IV(K)(g)(a).[10])  Sandidge had ICA hearings on July 6, 2020, July 29, 2020 (annual review), and September 10, 2020.  (Dkt. 32-1 ¶¶ 4, 6, 10.) He participated in the September 10, 2020, ICA hearing according to Dkt. 1-1 at 12.  Other reviews of the S-designation are conducted, but these reviews may not involve the inmate; thus, the inmates may not be aware of them.  For example, another group called the Dual Treatment Team also reviews the S-designations of offenders, informally and on an as-needed basis, but at least quarterly.  (Dkt. 32 at 6 ¶ 13.)[11]   Additionally, the Building Management Committee (BMC) also reviews the inmates who are S-designated at least monthly.  (Dkt. 32-8, VDOC LOP 830.A §§ IV(K)(e)–(f).)  The BMC collectively can recommend changes to an inmate's track levels, but it is not empowered to make recommendations about removing an S-designation.  (*Id.*)  Similarly, the Dual Treatment Team could, for a period of time relevant

---

[10] The relevant VDOC LOP 830.A that was in effect beginning in 2018 was amended effective October 1, 2020.  (*See* Dkts. 32-7, 32-8.)  Accordingly, two different versions of the LOP were in effect during the time of the events at issue in this suit.  However, the amendments do not alter the provisions relevant to this case unless specifically noted herein.  For clarity and brevity, the court cites to the most recent version where the provisions are identical.

[11] Defendants address only the specific hearings, reviews, and grievances mentioned in the complaint.  They do not provide a full rendition of all the formal and informal reviews, explain who made or contributed to every decision, or address facts not asserted in the complaint.  But, because Sandidge did not base his claims upon the lack of any particular hearing or review (other than his belief that he was entitled to an interim review or a redo of his annual review once the institutional disciplinary charge was dismissed), the incomplete record does not preclude summary judgment.

here, make recommendations collectively for changes to an inmate's S-designation, but it could not at any point itself change that designation. (Dkt. 32-7, VDOC LOP 830.A § IV(M)(d)(ii).) The Dual Treatment team could only advise the Regional Operations Chief and Warden of this recommendation for their consideration. (*Id.*) Under the revised policy effective October 2020, the Dual Treatment team's ability to make even recommendations about S-status was removed. (Dkt. 32-8, VDOC LOP 830.A § IV(K)(d)(2).) Finally, another group, the External Review Team, reviews S-designations bi-annually. (*Id.* § IV(J)(1)(a)(1).)

Within the S-designation, inmates are further designated into one of two tracks to complete the requirements of the step-down program,[12] which prepares the inmate for return to general population: Intensive Management ("IM") or Special Management ("SM"). (Dkts. 32 at 5–6 ¶¶ 9, 10; 32-8, VDOC LOP 830.A § III.) These tracks (also referred to as pathways) have different sublevels. For the IM track, the sublevels available are 0, 1, 2, and SL6. (Dkt. 32-8, VDOC LOP 830.A § IV(D)(1).) Sandidge was designated IM-0 status on August 3, 2020, after consideration by the Dual Treatment Team in accordance with LOP 830.A § IV(B)(1)(d). (Dkts. 32 at 6 ¶ 11; 32-1 ¶¶ 6–7.) Collins approved the determination that IM-0 status was appropriate on August 5, 2020. (Dkt. 32-1 ¶ 8.) Because there was no underlying recommendation to remove the S-designation at this time, Collins did not approve or disapprove anything relating to his S-designation. (*Id.*) An inmate's track or pathway is reviewed by an External Review Team bi-annually. (Dkt. 32-8, VDOC LOP 830.A

---

[12] S-designated inmates are required to participate in the step-down program in order to progress to lower security levels. (Dkt. 32-1 ¶ 6.)

§ IV(J)(1)(a).)  Both the BMC and Dual Treatment Team can collectively recommend track changes if there is unanimous consent.  (*Id.* §§ IV(K)(d)(2), (f).)

A final designation given to inmates is their good time earning level.  After his ICA hearing on July 6, 2020, Sandidge's good time earning level was changed from Level II to Level IV[13] on the annual hearing for review of good time levels on July 29, 2020.[14]  (Dkts. 1-1 at 2; 32 at 8 ¶ 22.)   The ICA,specifically non-defendant Stanley, recommended that Sandidge be moved to good time earning level IV, and he did not make a recommendation that the S-designation be changed.  (Dkts. 32 at 9 ¶¶ 25, 27; 32-1 ¶¶ 6, 8; 1-1 at 2.)  Defendant Collins approved the good time level change (the only thing that had been recommended for a change) on August 5, 2020.   (Dkts. 32 at 9 ¶ 27; 32-1 ¶ 8.)   Because there was no underlying recommendation that Sandidge's S-designation be removed, Collins did not approve or disapprove the ongoing S-designation or make any recommendations about it.  That same day the institutional charge against Sandidge was dismissed, but there is no evidence in the record indicating that Collins knew the charge had been dismissed or could have known that. Sandidge did not make a request for the removal of the S-designation until August 22, 2020, after he had received the notice that the institutional charge had been dismissed on August 14, 2020—subsequent to the ICA hearing.  (Dkt. 32 at 10 ¶ 29.)

---

[13] Level IV is worse than Level II.

[14] Sandidge complained in grievances that the ongoing designation of Level IV was unfair given the eventual dismissal of his 105a institutional charge.  (Dkt. 32 at 13 ¶ 36.)  However, his level of good time earnings was not impacted solely by the ultimately dismissed 105a charge.  During the relevant time period, Sandidge had another charge for indecent exposure, referred to as a 137b charge, and other factors which impacted his level. (*Id.* at 13 ¶ 36; 32-1 ¶ 6.)

Defendant Collins did approve the direction for Sandidge to complete the requirements of the step-down program on September 16, 2020, in connection with the September 10, 2020 ICA hearing.  (Dkt. 32-1 ¶ 10.)  This is a requirement for IM prisoners with the S-designation so that they can progress back to general population, and it is not a discretionary action in that there is not an option to excuse an inmate with the S-designation from the program if they wish to progress or to put them on a different Level other than Level 6 after the release of the S-designation.  (*See* Dkts. 32-6, VDOC OP 830.2 § IV(G)(8); 32-8 VDOC LOP 830.A § IV(D)(1).)

Critical to Sandidge's claims against Collins is the scope of Collins' authority to remove the S-designation.  Collins does not have authority to remove the S-designation.  (Dkts. 32-1 ¶ 10; 32-6, VDOC OP 830.2 § IV(E)(5)(a) ("Security Level Reductions: The Facility Unit Head [Warden] or designee has the authority to approve an annual review security level reduction.").)  However, the External Review Team *can* approve a reduction.  (Dkt. 32 at 7 ¶ 16.)  And VDOC's CCS has responsibility for the final authorization of a reduction in security level restrictions.  (Dkts. 32 at 7 ¶ 16; 32-1 ¶ 13.)  The Dual Treatment team can also recommend that the S-designation be removed if there is unanimous consent among the members to do so, but the ultimate "[d]ecisions are the responsibility of the Wardens and Regional Operations Chief."  (Dkt. 32-8, VDOC LOP 830.A § IV(K)(d)(2).)  The Dual Treatment team can be composed of a variety of individuals, (*see id.* § IV(K)(d)(1)), including the Chief of Housing and Programs, Unit Managers, counselors, and corrections officers.  Similarly, the Building Management Committee (again consisting of a variety of personnel) is empowered to make recommendations within the SM and IM tracks by unanimous consent.  (*Id.* §§ IV(K)(e)–(f).)

The BMC is not empowered to recommendations about S-status. (*Id.* § IV(K)(f).)  No party submitted evidence about whether particular Defendants were on these teams or committees. But even assuming any of the Defendants were by virtue of their job titles on these committees, their individual members cannot remove designations or individually recommend removal.   (Dkt. 32 at 11 ¶ 32.)

On September 10, 2020, Sandidge had another ICA hearing, in which he participated. (Dkt 1-1 at 4 (showing offender statement made during hearing).)  The ICA recommended continuing the S-designation and IM-0 status because of Sandidge's lack of completion of the step-down program requirements.  (*Id.*)  Defendant Collins approved the IM-0 designation on September 16, 2020, and noted that the ICA continued to recommend the S-designation.  (*Id.*)  Collins' approval was for the "[i]nternal status change to [or continuation of] Intensive Management 0."  (*Id.*)  At this point, the institutional charge had been dismissed, but the ICA had no pending recommendation to change the S-designation, so Collins did not approve, disapprove, or recommend any change.  This September 16, 2020, review is thus the only occasion on which Collins even referenced Sandidge's S-designation after the institutional disciplinary charge conviction was overturned.

Sandidge was advanced to IM-1 status (an improvement) on January 29, 2021.  (Dkt. 32 at 13–14 ¶ 37.)  He was approved to the IM-reentry pod (where inmates begin to prepare for a return to general population) on April 5, 2021.  (*Id.* ¶ 38.)  He was assigned the corresponding Security Classification Level 6 at this time, and the S-designation was removed. (*Id.*; Dkt. 32-1 ¶ 12.)  After his 2022 Circuit Court criminal conviction for his attack on the guard, time was added to his sentence.  (Dkt. 32-1 ¶ 12.)  Sandidge was moved back to the

IM-closed pod on August 16, 2022, because he was no longer within two years of his release date. (*Id.*)

The total time that Sandidge was subject to the S-designation was therefore approximately nine months--from around July 6, 2020, to April 5, 2021.

## II.    Standard of Review

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). Moreover, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. Instead, the non-moving party must produce "not 'merely colorable' but 'significantly probative' evidence" from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249–50). Disputes about conclusions of law do not prevent the entry of summary judgment.

*Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

### III.    Analysis

A. <u>Sandidge's core premise in Claim 1 that Defendants were required to remove his S-designation after the dismissal of institutional charge is incorrect.</u>

Sandidge contends that, after his disciplinary charge appeal was upheld and the institutional charge was dismissed, he should have no longer been assigned the S-designation.

This is not, however, what the regulations provide. The S-designation is not linked to institutional charges. Rather, the S-designation is for offenders with the "potential for extreme and/or deadly violence" against staff or other offenders. (Dkt. 32-8, VDOC LOP 830.A § III.) The regulations explicitly provide that the S-designation may be appropriate for an offender who committed an "Aggravated Assault on staff." (*Id.* § IV(A)(2)(a); *see also* Dkt. 32-6, VDOC OP 830.2 § IV(G)(2) (same).) Sandidge did, in fact, commit an aggravated assault on staff, and he ultimately pled guilty to the criminal charges arising from the assault. Under VDOC regulations, the assault, even if a one-time incident, was sufficient to justify the S-designation and remained sufficient until Sandidge completed the requirements of the step-down program such that he could be returned to general population.

No provision of the regulations states that a designation or security classification must be changed when an institutional charge is dismissed or expunged. No provision of the regulations requires that an annual review be "redone" when an institutional charge is dismissed or expunged. In fact, the regulations state that "[o]ffenders assigned to segregation status will be afforded security level reviews only as a part of the formal segregation review process" as provided in other OPs. (Dkt. 32-6, VDOC OP 830.2 § IV(G)(1)(a).) They further

provide that even when an interim review is conducted, the date of an inmate's annual review does not change.  (*Id.* § IV(E)(3)(c).)

VDOC OP 830.1 § IV(E)(1) (Dkt. 32-1 at 17) does provide that an offender can ask for an interim review if the inmate feels a change is warranted.  The regulations state what criteria could be considered on an interim review and "[s]tatus change resulting from an expunged institutional infraction" is listed.  (*Id.* at 18, VDOC OP 830.1 § IV(E)(3)(c).) However, nothing in the regulation states that the dismissal or expungement of an institutional charge mandates re-assessment or re-classification or requires an interim review.  Although Sandidge was not given what was termed an "interim review," the record shows that his status was often assessed during the nine months he was S-designated.

Accordingly, the foundation upon which Sandidge's claims are built is faulty.  As multiple affiants reported, both Sandidge's initial and ongoing classification with the S-designation was appropriate under VDOC Operating Procedures.  (Aff. of Mathena, Dkt. 32-3 ¶ 6; Aff. of Collins, Dkt. 32-1 ¶ 9; Aff. of Turner, Dkt. 40 ¶ 5; Aff. of Fuller, Dkt. 32-2 ¶¶ 7, 8.)  There is simply no support for Sandidge's contention that he was entitled to re-classification.

The court turns now to the particular merits of each of Sandidge's claims.

B.  <u>Sandidge's claims against Turner, Fuller, and McCowan fail because they are related to their responses to Sandidge's grievances, which is not a basis for liability.</u>

Sandidge's claims against Defendants Turner, Fuller, and McCowan as stated in the complaint only relate to their involvement in the grievance process.  Sandidge contends that these Defendants responded unfavorably to Sandidge's complaints or grievance appeals by

concluding they were unfounded. These allegations are insufficient to state a plausible constitutional claim.

There is no liability under § 1983 for a prison administrator's response to a grievance or appeal. *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994); *Brown v. Va. Dep't of Corr.*, No. 6:07-CV-00033, 2009 WL 87459, at *13 (W.D. Va. Jan. 9, 2009). Similarly, an inmate does not have a constitutional right to participate in grievance proceedings. *Adams*, 40 F.3d at 75. "An inmate thus cannot bring a § 1983 claim alleging denial of a specific grievance process, for example." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017). Likewise, "any mistakes [the defendants] made in investigating or ruling on plaintiff's grievances do not rise to the level of a due process violation." *Smith v. Jones*, No. 1:20cv1157, 2021 WL 4046403, at *4 (E.D. Va. Sept. 3, 2021); *see also Christian v. Thomas*, No. 3:20cv804, 2022 WL 1303270, at *11 (E.D. Va. May 2, 2022) ("Because Plaintiff enjoys no constitutional right to participate in grievance proceedings, his allegation that Defendant Reedy improperly responded to his grievance is legally frivolous.").

Next, none of Turner's and McCowan's responses to informal complaints nor Fuller's responses to grievance appeals demonstrates their personal involvement with any of Sandidge's claims. "In the prison context, allegations that a defendant-prison administrator simply reviewed or responded to the plaintiff's grievance describing *other* defendants' allegedly unconstitutional conduct typically is not enough to demonstrate the administrator's personal involvement in the underlying constitutional violation." *Jones v. Harrell*, No. 7:21-cv-00541, 2024 WL 1249510, at *13 (W.D. Va. Mar. 22, 2024) (granting summary judgment to administrator who only responded to grievances). Therefore, a prison official's "after-the-fact

-17-

denial of a grievance falls far short of establishing § 1983 liability." *DePaola v. Ray*, No. 7:12-cv-00139, 2013 WL 4451236, at *8 (W.D. Va. July 22, 2013). Finally, none of the challenged responses to the grievances appear incorrect in any event because Sandidge's core contention that the S-designation was required to be removed is wrong.

For all these reasons, Sandidge has failed to state any actionable claim against Defendants Turner (Counts 4, 6), Fuller (Counts 9, 11), and McCowan (Count 12) based on their responses or lack of responses to grievances, and these Defendants are entitled to judgment as a matter of law.

C. <u>Additionally, the claims against Turner, Fuller, and McCowan fail because Sandidge did not establish any qualifying personal involvement in a constitutional violation or any supervisory liability.</u>

Relatedly, Sandidge has failed to sufficiently allege that Defendants Turner, Fuller and McCowan were personally involved in any constitutional violation. To state a cognizable claim, the plaintiff must show direct personal involvement by each particular defendant. *See Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (noting that liability in a civil rights case is "personal, based upon each defendant's own constitutional violations"). As explained in the preceding section, the specific allegations against Defendant Turner, Fuller, and McCowan in the complaint relate to their after-the-fact involvement in responding to grievances, which is not a basis for their liability.

In his briefing, Sandidge states that he asked "Collins, Fuller, Turner, [and] McCowan . . . if I could be released from segregation when I seen them come around approx. once a month to do a Security Check . . . and they all would tell me they would 'look into it' but I never was released or given 'less Restrictive Liberty.'" (Dkt. 38 at 3–4.) He also says he

told the four remaining Defendants of the need for an interim review. (*Id.* at 7.) Therefore, the court also considered whether Defendants could be held liable for these actions were the complaint to be amended. They could not.

As is the case with Defendant Collins, Defendants Turner and McCowan do not have individual authority to remove the S-designation/step-down requirements. (Aff. of Turner, Dkt. 40 ¶ 5 (stating he lacked sole authority); Aff. of McCowan, Dkt. 32-4 ¶ 5 (stating she lacked any authority).) No evidence submitted or regulatory authority indicates that Defendant Fuller had individual authority. Additionally, as explained above, no interim review was required under the regulations. Accordingly, these Defendants could not be held liable for the alleged failure to do what they were not empowered or required to do.

As to Defendant Fuller, Sandidge does contend that he should be held liable in his supervisory capacity for failing to correct the conduct of his subordinates. Fuller was the Assistant Warden. (Aff. of Fuller, Dkt. 32-2 ¶ 1.) Fuller's alleged conduct relates to his upholding adverse grievance rulings against Sandidge.

In other types of cases not arising under § 1983, sometimes defendants can be held liable for the acts of subordinates under the doctrine of vicarious liability or *respondeat superior*. However, liability for the acts of others is not available in actions brought under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("[B]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Sandidge agrees that he is not seeking to hold Defendants liable under a *respondeat superior* theory. (Dkt. 38 at 6 ("I am a pro se prisoner who doesn't assert Respondeat Superior claims in this § 1983 claim . . . .").)

Instead, Sandidge does contend in the complaint that Defendant Fuller should be held liable for his alleged supervisory liability. Specifically in his designated claim 18 (which was recharacterized by Defendants as Count 12), he asserts that Defendant Fuller "violated my 8th Amendment right when he exhibited indifference and negligence in his supervision of his suborniates [sic] during the grievance procedure, failing to overturn their finding and restoring me to my previous status." (Dkt. 1 ¶ 18.)

Supervisory liability can be a basis for liability under § 1983 when a superior is deliberately indifferent to the violations of law of subordinates. *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984) ("[S]upervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates."). "Liability in this context is not premised on *respondeat superior*, but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Id.* (citations omitted). As the Fourth Circuit has explained:

> In order to succeed on a § 1983 claim for supervisory liability, a plaintiff must show: (1) that the supervisor had actual or constructive knowledge that h[er] subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)) (alteration in original).

"As to the first element, [e]stablishing a pervasive and unreasonable risk of harm requires evidence that the conduct is widespread, or at least has been used on several different

-20-

occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Id.* (quoting *Shaw*, 13 F.3d at 799) (internal quotation marks omitted). "As to the second element, a plaintiff 'may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses.'" *Id.* (quoting *Shaw*, 13 F.3d at 799). "Finally, as to the third element, 'proof of causation may be direct . . . where the policy commands the injury of which the plaintiff complains . . . or may be supplied by the tort principle that holds a person liable for the natural consequences of his actions.'" *Id.* at 226–27 (quoting *Shaw*, 13 F.3d at 799).

Overall, "[t]he plaintiff . . . assumes a heavy burden of proof in supervisory liability cases" for "[h]e not only must demonstrate that the prisoners face a pervasive and unreasonable risk of harm from some specified source, but he must show that the supervisor's corrective inaction amounts to deliberate indifference or 'tacit authorization of the offensive [practices].'" *Slakan*, 737 F.2d at 373 (quoting *Orpiano v. Johnson*, 632 F.2d 1096, 1101 (4th Cir. 1980)) (last alteration in original). "[H]e cannot satisfy his burden of proof by pointing to a single incident or isolated incidents, . . . [n]or can he reasonably be expected to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Id.*

Under these high standards, Sandidge's claim against Fuller for his supervisory liability fails. Sandidge only makes broad-sweeping references to Defendant Fuller in connection with his status as a supervisor and fails to allege any conduct of a subordinate that posed an unreasonable risk of harm or constitutional injury – allegations insufficient to state a claim against him under a theory of supervisory liability. As stated above, Sandidge's underlying

premise that the S-designation was wrongly retained is wrong.  So, any supervisors were not acting wrongly when they failed to agree with Sandidge's premise.

> D. <u>Sandidge's claim that Defendant Collins violated his right to due process under the Fourteenth Amendment fails for lack of a factual basis and proximate cause.</u>

Sandidge alleges that he was wrongfully held in administrative segregation after the dismissal of his institutional disciplinary conviction and that he did not receive adequate process or consideration for release from administrative segregation, in violation of his due process rights under the Fourteenth Amendment.  Specifically, in Count 1, Sandidge claims that Defendant Collins violated his Fourteenth Amendment due process rights by depriving him of a protected liberty interest without due process when Collins reviewed and approved his S-designation on August 5, 2020, and September 16, 2020.

As set forth above in Section I(B)(3), Defendant Collins was not involved in assigning Sandidge the S-designation initially.  He did not have authority to remove the S-designation. He did approve the designation of Sandidge as IM-0, but that designation was not challenged in Sandidge's complaint.  He did approve the movement of Sandidge to Level 6 after his release from the S-designation, but that is neither challenged by Sandidge in the complaint nor is it a discretionary action as all inmates receive that designation after removal of the S-designation.  As detailed above, Collins was never presented with any recommendation from another individual or group to remove the S-designation, so he did not deny or approve the recommendation of someone else.  He did not independently recommend removal of the S-designation in any of his capacities.  But Collins' failure to do so was not wrongful such that it could violate due process given that the S-designation was appropriate as explained above in Section III(A).

Sandidge cites LOP 830.A and OP 830.1 as the source of his contention that Collins did have the authority to remove the S-designation.  (Dkt. 39 at 1–2.)  Nothing in 830.A or 830.1 gives Collins as Unit Manager the authority to remove the S-designation.  A Unit Manager can have a role on the Dual Treatment Team and does have a role on the Building Management Committee, but these collectives only can make recommendations, and the recommendations are made only if the collective unanimously agrees as explained in Section I(B)(3).  The committees (much less their individual members) are not authorized to remove the S-designation.  Instead, the Facility Unit Head/Warden has the authority to approve or disapprove of "[s]egregation assignments, reviews and removals."  (Dkt. 32-1 at 15, VDOC OP 830.1 §IV(C)(5)(a)(iv).)

Collins' involvement is thus too attenuated and his actual authority too limited to support a claim that he violated Sandidge's due process rights in any event.  "To establish causation of a constitutional deprivation, Plaintiffs must show an 'affirmative causal link' between the Defendants' constitutional violation and the harm suffered by the Plaintiffs." *Simmons v. Balt. City Police Dep't*, No. 21-cv-00969, 2023 WL 8452448, at *16 (D. Md. Dec. 6, 2023).  As the Fourth Circuit has explained, "[o]f course, constitutional torts, like their common law brethren, require a demonstration of both but-for and proximate causation." *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012).  In *Evans*, the Fourth Circuit considered a Fourth Amendment claim and found that "subsequent acts of independent decision-makers (*e.g.*, prosecutors, grand juries, and judges) may constitute intervening superseding causes that break the causal chain between a defendant-officer's misconduct and a plaintiff's unlawful seizure." *Id.*  In this case, Collins' downstream involvement from the ultimate decision-maker

-23-

as to removal of the S-designation would also "break the chain" of causation, such that he could not be held liable for any failure to recommend removal of the S-designation. *See Slakan*, 737 F.2d at 376 ("Though their conduct may be fairly characterized as a breach of their legal and constitutional duties, they are not liable unless an affirmative causal link exists between their inaction and the harm suffered by [plaintiff]."); *cf. Adkins v. Bd. of Educ. of Magoffin Cnty., Ky.*, 982 F.2d 952, 959 (6th Cir. 1993) ("The fact that a person who has authority only to recommend, and whose recommendations can be implemented only upon subsequent approval by a governing body, decides to make no recommendation does not convert the recommender into a final policymaker.").

In a factually similar case arising in New York, an inmate claimed that his due process rights had been violated because of inadequate post-assignment review of his assignment to segregation. *Edmonson v. Coughlin*, 21 F. Supp. 2d 242, 244–46 (W.D.N.Y. 1998). The inmate named as defendants individuals who served on the committee (referred to as the ASRC) that reviewed the status and made recommendations as to whether the status should continue. The court considered the role of each named defendant and found that:

> DOCS' regulations require the ASRC to recommend whether to continue an inmate in AS or release him. The recommendation is sent to the superintendent, who decides whether to release the inmate or continue his confinement. 7 N.Y.C.R.R. § 301.4(d). The regulations give the ASRC responsibility akin to that of an officer who prepares an initial AS recommendation. The ASRC is not authorized to release an inmate from AS, or to order his continued confinement. Its only authority is [to] make a recommendation to the superintendent. ASRC members, therefore, did not have personal involvement in Edmonson's AS confinement, and the complaint must be dismissed, as against them.

*Id.* at 256.

Similarly, Sandidge's due process claims against Collins (Count 1) must be dismissed.

-24-

E.  Sandidge has not stated a plausible conditions of confinement claim under the Eighth
Amendment.

As is the case with many *pro se* cases, Sandidge's contentions have shifted over time.
The complaint narrowly defines the claimed cruel and unusual punishment that violates the
Eighth Amendment as Sandidge's continued S-designation after the dismissal of the
institutional charge.  *See* note 4, supra.  What is claimed to be cruel and unusual is the alleged
due process violation.  The complaint did not specify any other specific condition of
confinement that Sandidge claimed to be cruel and unusual.[15]  In fact, the complaint does not
even contain the word "condition" of confinement; its references to the Eighth Amendment
are conclusory only.  There is no evidence that Sandidge exhausted any claims about
conditions of confinement.

However, in his subsequent briefing, Sandidge included complaints about the
conditions attendant with the S-designation.  Even in his briefing, Sandidge did not allege that

---

[15] The previously dismissed Defendants noted this deficiency in support of their motion to dismiss.  (Dkt 22.)  They noted that Sandidge's complaint was:

> devoid of any allegations concerning his conditions; instead, Plaintiff alleges that his May 28, 2020 disciplinary infraction was dismissed, but these Defendants have failed to release him from segregation. A review of his allegations confirms his failure to plead facts to show he is being deprived of a basic human need or that prison officials are indifferent to the conditions of his confinement.

(Id. at 18.)  This deficiency has not been cured.  In support of the summary judgment motion, the remaining Defendants focused on Sandidge's failure to allege a qualifying injury, noting that his allegations failed to state a claim under the Eighth Amendment.  (Dkt. 32 at 30.)  The court must dismiss a complaint filed *in forma pauperis* "at any time" the court determines that the complaint "fails to state a claim on which relief may be granted."  28 U.S.C. § 1915(e)(2)(B)(ii).  As the Fourth Circuit has found, "[l]ogically, if a court must dismiss such a case at any time, it may do so at any procedural posture, including summary judgment."  *Blakely v. Wards*, 738 F.3d 607, 612 (4th Cir. 2013), *as amended* (Oct. 22, 2013) (holding that a summary judgment dismissal on the basis that a complaint fails to state a claim upon which relief could be granted counts as a strike under the PLRA); *see also Haskins v. Fox*, No. CIV.A. 00-210-AM, 2001 WL 34797733, at *2 (E.D. Va. May 14, 2001), *aff'd*, 21 F. Appx. 175 (4th Cir. 2001) (granting a motion for summary judgment because plaintiff "has failed to state a claim upon which relief may be granted" and therefore defendants were entitled to judgment as a matter of law).  Accordingly, remaining Defendants are entitled to judgment as a matter of law under Rule 56.

he was deprived of any necessity for life, such as food, shelter, or medical care. Rather, he complains about higher levels of restraint, fewer privileges, and isolation. (*See* Dkt. 38.) He claims emotional damage resulting from isolation, although he was S-designated for only a few months.

The court finds that Sandidge's complaint does not set forth a plausible claim entitled to relief under the Eighth Amendment because his claim is conclusory and devoid of any facts that would support a viable Eighth Amendment claim. "It is well-established that parties cannot amend their complaints through briefing or oral advocacy." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013). The allegations in the complaint assert only a threadbare claim that the Eighth Amendment was violated. Because Sandidge did not specify any particular conditions, the briefing and evidence are not fully developed, so the court does not reach the merits of any Eighth Amendment claim.[16] It finds instead that Sandidge failed to identify facts indicating a plausible claim of entitlement to relief as to any traditional claim arising from conditions of confinement.

Even if the alleged due process violation could itself support an Eighth Amendment claim, such a claim would also be properly dismissed. There is no clearly established authority existing from which the Defendants would have reasonably known they were infringing the Constitution when they failed to release Sandidge from the S-designation after his institutional charge was dismissed. Therefore, the Defendants would be entitled to qualified immunity. As the Fourth Circuit recently explained: "Not every violation of prison policy is a violation of

---

[16] The court notes that the conditions of solitary confinement at Red Onion State Prison have been challenged squarely as violating the Eighth Amendment in another pending case, *Thorpe v. Clarke*, No. 2:20-cv-00007. The fully developed record in that case provides a much better basis to assess the issues raised by Sandidge belatedly in his briefing.

the constitution. And qualified immunity cares about violations of clearly established constitutional law, not clearly established prison policy." *King v. Riley*, 76 F.4th 259, 267–68 (4th Cir. 2023). Here, Sandidge failed to even establish a violation of prison policy, much less a violation of clearly established constitutional law. Additionally, none of the named Defendants would have been the proximate cause of the conditions experienced while Sandidge retained the S-designation so dismissal would be also appropriate under the reasoning in the prior section.

F. Defendants are immune from monetary damages in their official capacities.

Finally, dismissal of all official capacity claims for monetary damages against Defendants is warranted. Plaintiffs may not recover damages against state officials sued in their official capacities under § 1983. "[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Thus, all official capacity claims for monetary claims against Defendants should be dismissed.

## IV.    Conclusion

For the reasons stated above, the court **GRANTS** the remaining Defendants' motion for summary judgment (Dkt. 31). This Memorandum Opinion resolves all claims asserted by Sandidge, and so this action will be dismissed. An appropriate Order will follow. The Clerk is **DIRECTED** to send a copy of this Memorandum Opinion and accompanying Order to Sandidge.

**ENTERED** this 27th day of March 2025.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE